**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

| | | |
|---|---|---|
| **DARLENE FAY GREEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:12-03824** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**M E M O R A N D U M   O P I N I O N**

This is an action seeking review of the decision of the Commissioner of Social Security

denying Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 40 - 433, 1381-1383f.

This case is presently pending before the Court on the parties' cross-Motions for Judgment on the

Pleadings. (Document Nos. 9 and 10.) Both parties have consented in writing to a decision by the

United States Magistrate Judge. (Document Nos. 3 and 4.)

The Plaintiff, Darlene Fay Green (hereinafter referred to as "Claimant"), filed applications for

DIB and SSI on September 16, 2008, alleging disability as of February 15, 2007, due to "chest pain,

hiatal hernia, depression, nerves, thyroid problems, carp[a]l tunnel in both wrists, heart problems,

nerve damage in neck, arthritis, severe pain in left arm, pre-skin cancer spots on face, rosacea." (Tr.

at 15, 146-48, 149-54, 155, 156-62, 163-66, 176, 181.) The claims were denied initially and upon

reconsideration. (Tr. at 68-73, 74-76, 80-82, 85-87, 91-93, 94-96.) On June 22, 2009, Claimant

requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 99-100.) The hearing was held

on October 21, 2010, before the Honorable Geraldine H. Page. (Tr. at 33-67.) By decision dated

November 8, 2010, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 15-27.) The

ALJ's decision became the final decision of the Commissioner on May 31, 2012, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) On July 30, 2012, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2010). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining

2

physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2010). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (C) *Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.
>
> (4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace),

we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

4

specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, February 15, 2007. (Tr. at 17, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "hypothyroidism, degenerative disc disease, arthritis with pain disorder, chest pain of unknown etiology, depression, and panic disorder," which were severe impairments. (Tr. at 17, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 18, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity for light exertional level work as follows:

> [T]he [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the [C]laimant has the residual functional capacity to lift and/or carry 10 pounds frequently and 20 pounds occasionally; to stand and/or walk for 6 hours in an 8-hour workday; and to sit for 6 hours in an 8-hour workday. The [C]laimant has the following work place limitations: frequent handling, fingering, and feeling; occasional climbing of ramps and stairs, balancing, and crawling; work that does not require working around hazardous machinery, at unprotected heights, climbing ladders, ropes, scaffolds or on vibrating surfaces; work that involves occasional interactions with the general public; and work that is limited to simple, routine repetitive, unskilled tasks.

(Tr. at 20-21, Finding No. 5.) At step four, the ALJ found that Claimant was unable to return to her past relevant work as a cashier fast food, nursing assistant, phlebotomist, companion, or materials

handler. (Tr. at 25, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform work as a cafeteria attendant, cleaner-housekeeper, and bagger, at the light and unskilled level of exertion. (Tr. at 25-26, Finding No. 10.) On this basis, benefits were denied. (Tr. at 26, Finding No. 11.)

<u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was born on April 15, 1958, and was 52 years old at the time of the administrative hearing, October 21, 2010. (Tr. at 25, 37, 156, 163.) Claimant had a ninth grade education and obtained her General Equivalency Diploma, and was able to communicate in English. (Tr. at 25, 37-38,

180, 189.) In the past, she worked as a fast food cashier, nursing assistant, phlebotomist, companion, and materials handler. (Tr. at 25, 38-40, 58-59, 181-83, 199-206.)

 The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

**Mental Impairments**:

***Bluestone Health Center***:

On July 16, 2007, Claimant complained to Dr. Rana of depression and anxiety, related to stress and worries over her mother. (Tr. at 255.) Dr. Rana stressed to her the importance of controlling the stress as it could contribute to her depression. (Id.) He prescribed Celexa 20mg, which was changed to Paxil 20mg on August 23, 2007. (Tr. at 254-55.)  On September 6, 2007, Claimant reported feeling depressed and anxious, complained of shortness of breath, and chest pain on and off without radiation. (Tr. at 253.) She was advised to start taking Aspirin and her medication was changed to Zoloft 25mg. (Tr. at 253.) Dr. Rana referred her for cardiolyte stress testing. (Id.)

***John Todd, Ph.D. - Psychiatric Review Technique***:

On June 5, 2008, Dr. Todd, a reviewing state agency consultant, completed a form Psychiatric Review Technique, on which he opined that Claimant's depression and panic disorders were not severe impairments. (Tr. at 269-82.) He opined that Claimant's mental impairments would result in mild limitations in maintaining activities of daily living, social functioning, concentration, persistence, or pace, and no episodes of decompensation each of extended duration. (Tr. at 279.) Dr. Todd noted that Ms. Jennings indicated in her November 2007, report that on mental status exam, Claimant had at most mild deficiencies, yet she opined that she was unable to hold gainful employment which was inconsistent with the mental status exam. (Tr. at 281.) Dr. Todd therefore, failed to give Ms. Jennings's

November 2007, opinions any weight as Claimant's mental status and activities did not indicate significant limitations due to a mental disorder. (Id.)

### *Elizabeth Jennings, M.A. & Melinda Wyatt*:

On November 27, 2007, Ms. Jennings conducted a psychological evaluation of Claimant upon referral of the West Virginia Department of Health and Human Resources. (Tr. at 349-53, 354-55.) Claimant reported depression, anxiety, and panic attacks as her presenting problems. (Tr. at 349.) She reported poor sleep, with difficulty going to sleep and intermittent awakening; frequent crying spells; poor energy level; worsening depression and anxiety for the previous six months; significant grief issues over the death of her mother in November 2011; and situational panic attacks, accompanied by shaking, inability to breathe, and chest pains. (Id.)

On mental status exam, Ms. Jennings observed that Claimant was cooperative; had mildly slowed psychomotor behavior; transported herself approximately ten minutes to the evaluation; maintained good eye contact; presented articulate and coherent responses; was oriented in all four spheres; had a dysphoric mood and labile affect; was tearful when discussing the death of her mother; presented no symptoms of psychosis, hallucinations, or delusions; had normal insight and judgment; had mildly deficient immediate memory, normal recent memory, and moderately deficient remote memory; and had mildly deficient concentration. (Tr. at 350-51.) The results of the Patient Pain Profile ("P3") indicated that Claimant had significant elevations in the areas of depression, anxiety, and somatization. (Tr. at 351.) The Beck Depression and Anxiety Inventories revealed scores in the severe range of symptoms. (Tr. at 352.)

Ms. Jennings diagnosed major depressive disorder, single episode, moderate; panic disorder,

without agoraphobia; bereavement; and assessed a GAF of 55.[2] (Tr. at 352.) Ms. Jennings recommended stabilization on psychotropic medication and individual therapy to assist in improving anxiety, depressive, and bereavement symptoms. (Id.) She opined that "additional stress is likely to result in decompensation due to the combination of physical and mental health issues." (Id.) Ms. Jennings concluded that Claimant was not "able to hold gainful employment." (Tr. at 352-54.)

Ms. Jennings began treating Claimant on February 14, 2008. (Tr. at 341.) On February 20, 2008, Claimant reported that she was feeling overwhelmed with her medical problems that she had ignored while caring for her mother. (Tr. at 347.) Ms. Jennings helped her process this information in hopes that her situation would soon stabilize. (Id.) On March 5, 2008, Ms. Jennings noted that she discussed with Claimant the stages of grief, anger, and depression regarding the death of her mother, as well as the relationship with her siblings. (Tr. at 346.) On March 13, 2008, Ms. Jennings completed a Routine Abstract Form Mental based on her February 20, 2008, exam of Claimant, on which she reported that Claimant was fully oriented; had normal speech, thought content, and psychomotor activity; and denied any delusions, hallucinations, or suicidal and homicidal ideations. (Tr. at 342.) Claimant's judgment was mildly deficient, her affect was labile, her mood was depressed and anxious, and her insight was mildly deficient. (Id.) Her diagnoses remained the same. (Tr. at 343.)

On March 19, 2008, Ms. Jennings continued to discuss Claimant's grief issues and on September 8, 2008, Ms. Jennings discussed her chronic pain issues. (Tr. at 344-45.) Ms. Jennings noted on September 8, that Claimant had not been seen for quite some time so an extended session was

---

[2] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. A GAF of 51-60 indicates that the person has moderate symptoms, or moderate difficulty in social, occupational or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed. 1994).

completed on that date. (Tr. at 344.) On October 1, 2008, Claimant reported that her abusive husband walked out on her after eleven years of marriage. (Tr. at 452.) Ms. Jennings noted that she was sad and tearful and that her response to treatment was fair. (Id.) Her mood was mildly dysphoric; she denied suicidal or homicidal ideations and delusions or hallucinations; and memory, cognition, and thought processes were normal. (Id.)

On November 5, 2008, Ms. Jennings's exam essentially was the same as last month, with the exception that Claimant's mood was mildly labile. (Tr. at 451.) Ms. Jennings noted that her response to treatment was fair to good and that she processed well. (Id.) On December 5, 2008, Ms. Jennings noted that Claimant was progressing regarding her grief issues and had planned to visit her mother's grave, which was "a major step for her." (Tr. at 450.) Claimant reported mild impairment in memory. (Id.)

Ms. Jennings next examined Claimant on March 31, 2009, at which time she continued to have difficulty dealing with the death of her mother. (Tr. at 449.) Nearly two months later, on May 18, 2009, Ms. Jennings reported that Claimant had a lot of difficulty with chronic pain and coping with the loss of her grandmother, whom she viewed as the last link to her mother. (Tr. at 448.) Ms. Jennings noted that Claimant's response to treatment was good and that she processed feelings very well. (Id.) On June 18, 2009, Claimant reported that she was anxious and stressed over her heart problems and Ms. Jennings noted that her response to treatment was fair and that she was tearful when expressing her feelings. (Tr. at 447.) On June 29, 2009, however, Ms. Jennings noted that Claimant's response to treatment was good, that she processed her feelings well, and that her prognosis was fair. (Tr. at 446.) Claimant reported that a recent heart cath revealed a blockage, but that upon examination, it was determined that she did not. (Id.)

On December 8, 2009, Ms. Jennings completed a form Mental Impairment Questionnaire (RFC

10

& Listings), on which she noted that Claimant was diagnosed with major depressive disorder, moderate, recurrent; bereavement; and assessed a GAF of 55. (Tr. at 440-45.) She indicated that Claimant was treated with individual counseling and that she had moderate progress in treatment. (Tr. at 440.) She opined that Claimant's prognosis was guarded. (Id.) Ms. Jennings opined that Claimant was seriously limited, but not precluded in her ability to travel in unfamiliar places. (Tr. at 443.) She opined that she was unable to meet competitive standards in her ability to remember work-like instructions; understand, remember, and carry out very short and simple instructions; maintain attention for two hour segments; maintain regular attendance and be punctual within customary, usually strict tolerances; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; make simple work-related decisions; ask simple questions or request assistance; be aware of normal hazards and take appropriate precautions; maintain socially appropriate behavior; and use public transportation. (Tr. at 441-43.) She further opined that Claimant had no useful ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; understand, remember, and carry out detailed instructions; set realistic goals or make plants independently of others; dealt with stress of semiskilled and skilled work; interact appropriately with the general public; and travel in unfamiliar places. (Id.)

Ms. Jennings noted that due to frequent panic attacks, Claimant "would have significant problems with maintaining gainful employment." (Tr. at 442.) She opined that Claimant had extreme restriction of activities of daily living and deficiencies of concentration, persistence, or pace; marked

difficulties in maintaining social functioning; and four or more repeated episodes of decompensation each of extended duration. (Tr. at 443-44.) Ms. Jennings opined that Claimant would miss more than four days of work per month. (Tr. at 444.)

**_Teresa E. Jarrell, M.A._**:

On December 30, 2008, Ms. Jarrell completed a consultative mental status examination of Claimant. (Tr. at 385-91.) Ms. Jarrell noted that Claimant was attentive and cooperative, and drove herself to the examination. (Tr. at 385.) On mental status exam, Ms. Jarrell noted that Claimant was alert, attentive, and cooperative; she appeared satisfactorily motivated; she was polite but appeared mildly anxious and depressed; her speech was non-spontaneous, but was normal in rate and volume, she was oriented in all four spheres; her affect was restricted; thought processes were linear; there was endorsement of symptoms of obsessive-compulsive behavior patterns though mildly paranoid thoughts were endorsed; insight, judgment, immediate memory, remote memory, and concentration were within normal limits; recent memory was mildly deficient; and psychomotor behavior was unremarkable. (Tr. at 388-89.) Ms. Jarrell diagnosed major depressive disorder, recurrent, moderate; panic disorder without agoraphobia; generalized anxiety disorder; and pain disorder associated with both psychological factors and a general medical condition. (Tr. at 389.) She opined that Claimant's prognosis was guarded with treatment and poor without.

Ms. Jarrell reported Claimant's activities to have included watching television, doing laundry, preparing simple meals, maintaining personal hygiene, managing medications, picking up her possessions, and assisting with maintaining household cleanliness. (Tr. at 390.) Ms. Jarrell opined that Claimant's social functioning was mildly deficient. (Id.) Claimant reported that she talked to her brother, son, and daughter-in-law on a daily basis; visited with her son who lives out of state at least once a year; visits with friends once or twice a month; and shops once a week at night to avoid crowds.

(Id.) Ms. Jarrell opined that Claimant's persistence and pace were mildly deficient. (Id.) She believed that Claimant was capable of managing her benefits. (Id.)

### Rosemary L. Smith, Psy.D.:

Dr. Smith completed a form Psychiatric Review Technique on January 12, 2009, on which she opined that Claimant's depression, panic disorder, generalized anxiety disorder, and pain disorder were non-severe impairments. (Tr. at 392-405.) She opined that Claimant's mental impairments resulted in mild limitations in maintaining activities of daily living, social functioning, concentration, persistence, or pace and no episodes of decompensation of extended duration. (Tr. at 402.) Dr. Smith opined that Claimant's activities were limited due to her physical problems and that there was "no evidence of significant functional limitations due to a mental impairment." (Tr. at 404.)

### Debra Lilly, Psy.D.:

On April 4, 2009, Dr. Lilly reviewed the evidence of file and affirmed Dr. Smith's Psychiatric Review Technique as written. (Tr. at 414.)

**Physical Impairments**:

### Shahid R. Rana, M.D.:

On January 31, 2008, Claimant reported midsternal chest pain with radiation to her left shoulder. (Tr. at 251.) She stated that she felt a heavy pressure on her chest. (Id.) Dr. Rana instructed her immediately to present to the emergency room for further evaluation. (Id.) Claimant was admitted to Princeton Community Hospital on January 31, 2008, with complaints of chest pain with radiation to the left arm of moderate to severe intensity and of several hours in duration. (Tr. at 287-88, 309-10.) A myocardial perfusion scan on February 1, 2008, revealed an absence of stress induced ischemia or infarct and normal LV wall motion, contractility, cavity size, and ejection fraction. (Tr. at 289, 318.) Cardiolite stress testing was negative for exercise induced ischemia, revealed no stress induced

13

arrhythmia, and indicated that Claimant's exercise capacity was fair. (Tr. at 290, 317.) Electrocardiograms were normal. (Tr. at 312, 314.) The x-rays of Claimant's chest were normal. (Tr. at 311.)

Claimant reported to Dr. Rana on February 14, 2008, that her chest pains had resolved. (Tr. at 285.) Dr. Rana noted that an Upper GI Series on February 6, 2008, revealed a hiatal hernia, for which she was taking Prevacid. (Tr. at 285, 291-92, 307-08.) Dr. Rana diagnosed GERD, hypothyroidism, and obesity. (Tr. at 285.) On June 26, 2008, Dr. Rana noted that Claimant had edema of the legs and dyspnea on exertion for two months, for which he ordered an echocardiogram to rule out LV dysfunction. (Tr. at 284.) He advised Claimant to lose weight and to follow a healthy low lipid and low salt diet. (Id.) Dr. Rana noted on August 11, 2008, that the echocardiogram was normal and that Claimant had usual dyspnea on exertion. (Tr. at 283, 551.) Claimant had lower leg edema, which was uncomfortable when she was on her feet. (Id.) Dr. Rana referred Claimant to a vein center due to questionable venous insufficiency. (Id.)

On June 2, 2009, Dr. Rana noted occasional chest pain not related to exertion and stable breathing. (Tr. at 550.) He assessed chest pain of questionable etiology, obesity, and hypothyroidism. (Id.) Dr. Rana ordered another cardiolyte stress test, continued her on her medications, and recommended a heart healthy low lipid and low salt diet. (Id.) A cardiolyte stress test on June 10, 2009, revealed fair exercise capacity and negative stress ischemia or stress induced arrhythmia. (Tr. at 416, 532, 547.) A myocardial perfusion study revealed mild anterior wall ischemia, no infarct, and normal LV wall motion, contractility, cavity size, and ejection fraction. (Tr. at 417, 533, 548-49.) On June 18, 2009, Dr. Rana noted that despite complaints of on and off chest pains, Claimant's breathing was stable, and she had no shortness of breath, palpitations, dizziness, or edema. (Tr. at 546.) He prescribed Toprol XL 25mg and Nitroglycerin to be used as needed. (Id.) He scheduled a cardiac catheterization

14

in Roanoke, Virginia. (Id.)

### Harold A. Cofer, Jr., M.D. - Bluewell Family Clinic:

On April 16, 2010, Claimant presented to Dr. Cofer, her family doctor, with no specific complaints but requested medication refills. (Tr. at 538.) Dr. Cofer noted on exam that Claimant's mental status was normal, with a confluent affect that was appropriate to the general situation and subject matter discussed. (Id.) She talked in a moderate rate and tone with extremely coherent thought processes. (Id.) The physical exam was unremarkable. (Id.) Dr. Cofer diagnosed generalized anxiety disorder, glucose intolerance, and hypertension, and refilled Claimant's medications. (Id.)

On December 30, 2009, Dr. Cofer completed a form Medical Opinion Re: Ability to Do Work-Related Activities (Physical), on which he opined that Claimant could lift and carry 50 pounds occasionally and 10 pounds frequently and stand, walk, and sit about two hours in an eight hour day, with alternating sitting, standing, and walking every hour. (Tr. at 454-56.) He opined that Claimant could stand 20 minutes at a time and needed to walk around every 30 minutes for five minutes. (Tr. at 455.) Dr. Cofer opined that Claimant could occasionally perform postural activities and that she had no impairment in her ability to reach, handle, finger, feel, push, or pull. (Id.) He further opined that her impairments would cause her to be absent from work about once a month. (Tr. at 456.)

### Amy Wirts, M.D. - Physical RFC Assessment:

Dr. Wirts, a reviewing state agency physician, completed a form Physical RFC Assessment on May 30, 2008, on which she opined that Claimant's hypothyroidism, obesity, and nose impairments, essentially did not limit Claimant physically in her ability to perform work-like activities. (Tr. at 261-68.) She assessed no physical limitations and concluded that Claimant was partly credible. (Tr. at 266.)

### Khalid R. Rana, M.D.:

On September 12, 2008, Dr. Rana examined Claimant for complaints of arm and hand pain,

greater in the left. (Tr. at 358.) Examination essentially was unremarkable. (Id.) Nerve conduction studies and an EMG revealed very mild carpal tunnel syndrome ("CTS") on the left, normal on the right, and an unremarkable EMG study. (Tr. at 359-60.)

### *Rogelio Lim, M.D.*:

On November 20, 2008, Dr. Lim, a state agency reviewing consultant, completed a form Physical RFC Assessment, on which he opined that Claimant's non-cardiac chest pain, hiatal hernia, CTS, rosacea, and dextroscoliosis limited her to performing medium exertional level work with frequent postural limitations and occasional limitations in climbing ladders, ropes, and scaffolds. (Tr. at 378-84.) He further opined that Claimant should avoid concentrated exposure to vibration. (Tr. at 381.)

### *James Egnor, M.D.*:

On March 27, 2009, Dr. Egnor, another state agency reviewing consultant, completed a form Physical RFC Assessment, on which he opined that Claimant's physical impairments allowed her to perform work at the medium level of exertion that avoided concentrated exposure to extreme cold and vibration. (Tr. at 406-13.)

### *Princeton Community Hospital*:

Claimant reported to the emergency room on September 3, 2008, with complaints of pain in her entire upper body with movement and deep breathing. (Tr. at 483.) An EKG was normal and x-rays of the thoracic spine revealed minimal dextroscoliosis of the upper thoracic spine with minimal osteophytosis and other degenerative change but otherwise, was negative. (Tr. at 493.) A chest x-ray revealed no acute cardiopulmonary disease. (Tr. at 494.)

On July 31, 2010, Claimant went to the emergency room after being involved in a motor vehicle accident. (Tr. at 503-05, 521.) The x-ray of her left wrist was negative (Tr. at 509.), and the

16

x-ray of her thoracic spine was unchanged from her September 3, 2008, exam. (Tr. at 510.) The x-ray of Claimant's lumbar spine, cervical spine, pelvis and right hip, and right ankle were negative (Tr. at 511, 514, 516-17.), and the x-rays of her right tibia and fibula revealed no fracture or dislocation. (Tr. at 512.) The x-rays of Claimant's right femur revealed a comminuted and impacted acute fracture. (Tr. at 513, 515.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in failing to give controlling weight to the opinion of Ms. Jennings. (Document No. 9 at 5-13.) Claimant asserts that Ms. Jennings treated Claimant for 16 months and that based upon the VE's testimony that an individual could not perform work with Ms. Jennings's assessed limitations, the ALJ should have given a fully favorable decision. (Id. at 5.) Claimant asserts that the ALJ interposed her own inexpert opinion in place of the medical expert's opinion. (Id. at 5-7.) Contrary to Ms. Jennings's conclusions, Claimant asserts that the ALJ improperly found that because she could perform the most basic of daily activities, she had only mild functional impairment. (Id. at 7.) Claimant asserts that the ALJ failed to consider her testimony, which was consistent with the record, as to the restrictions of her activities of daily living. (Id. at 8.) Regarding social functioning, Claimant asserts that the ALJ performed a shallow review of the record and failed to acknowledge that she suffered panic attacks when she left her house and when with family, and that she cried at home when alone. (Document No. 9 at 8-9.)

Claimant further asserts that the ALJ improperly discredited Ms. Jennings's opinion because Claimant's conditions were caused by life stressors and were situational as opposed to clinical. (Document No. 9 at 9-10.) Claimant contends that the reasons underlying her mental impairments have no bearing on the case and that it only matters that she suffers from the conditions. (Id.) Claimant also

asserts that the ALJ improperly found that Ms. Jennings's opinion was inconsistent with the record. (Id. at 15.) Claimant notes that the treatment notes reflect her complaints at each visit and Ms. Jennings's testing, which supported her findings of significant depression and anxiety. (Id.) The ALJ gave great weight to Ms. Jarrell's opinion, which contained the same diagnoses as Ms. Jennings and essentially the same complaints. (Id.) Claimant notes however, that Ms. Jarrell neither provided an assessment of specific mental functioning, nor disputed the one provided by Ms. Jennings. (Id. at 11.) Ms. Jennings, therefore, was the only source who provided an assessment of actual functioning, and Claimant asserts that the ALJ erred in concluding that her opinion was inconsistent with Ms. Jarrell's opinion. (Id.) Claimant contends that GAF scores have no direct correlation to the severity requirements of mental disorders listings, and therefore, the ALJ erred in using that fact to address the weight to be given Ms. Jennings's opinions. (Id.) Finally, Claimant asserts that had the ALJ given controlling weight to the opinion of Ms. Jennings, she would have met Listing 12.04. (Tr. at 12.)

In response, the Commissioner asserts that substantial evidence supports the ALJ's finding that Ms. Jennings's opinion was not entitled to much weight. (Document No. 10 at 12-15.) The Commissioner asserts that the ALJ properly found that Ms. Jennings's opinion was inconsistent with her own reported mental status exam findings because the findings were fairly unremarkable. (Id. at 12.) Furthermore, Ms. Jennings assessed a GAF of 55, which indicated only moderate limitations in social or occupational functioning. (Id. at 13.) The Commissioner asserts that the ALJ also properly found that Ms. Jennings's opinion was unsupported by her treatment notes, as well as the treatment notes of Dr. Cofer. (Id.) Furthermore, the Commissioner asserts that the ALJ properly found that Ms. Jennings's opinion was inconsistent with the opinions of Ms. Jarrell and the reviewing state agency psychologists. (Id.) The Commissioner notes that Ms. Jarrell reported fairly unremarkable findings on mental status exam and that though she suffered situational depression related to her mother's death,

Claimant had at most mild deficiencies. (Id. at 13-14.)

The Commissioner also asserts that the ALJ correctly determined that Claimant did not meet Listing Impairment 12.04. (Document No. 10 at 14.) In assessing the "B" criteria, the Commissioner asserts that the ALJ properly relied on the state agency psychologists and found that Claimant had only mild deficiencies in activities of daily living, social functioning, concentration, persistence, or pace, and no episodes of decompensation of extended duration. (Id. at 14-15.) The Commissioner asserts that neither the record supports a finding that Claimant met the "C" criteria, nor does Claimant argue the same. (Id. at 15.) Because Claimant failed to prove she met all the criteria for Listing 12.04, the Commissioner asserts that the record supports the ALJ's finding that she did not. (Id.)

Claimant also alleges that the ALJ's decision is not supported by substantial evidence because the ALJ ignored Dr. Cofer's medical source statement and "failed to properly explain the basis for the weight given the opinion." (Document No. 9 at 12.) She asserts that the ALJ failed to discuss that the VE testified that Dr. Cofer's opinion would preclude all work and she failed to give any basis for according his opinion only partial weight. (Id. at 13.)

In response, the Commissioner asserts that the ALJ specifically discussed Dr. Cofer's opinion and that she gave the opinion only partial weight to the extent that it was consistent with her RFC assessment. (Document No. 10 at 15.) The Commissioner notes that the ALJ thoroughly discussed the medical evidence  supporting her opinion in the pages preceding her discussion of the opinion evidence. (Id. at 15-16.) The Commissioner notes that the ALJ also considered Claimant's testimony. (Id. at 16.) The Commissioner therefore asserts that the ALJ credited Dr. Cofer's opinion to the extent that it was consistent with the evidence as a whole, pursuant to the Regulations, and properly assigned a weight to Dr. Cofer's opinion in her decision. (Id.)

Analysis.

<u>Ms. Jennings</u>.

Claimant first alleges that the ALJ erred in failing to give controlling weight to the opinion of her treating psychiatrist, Ms. Jennings. (Document No. 9 at 5-13.) Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

<u>See</u> 20 C.F.R. §§404.927(e)(2), 416.927(e)(2) (2010).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

<u>Diaz v. Chater</u>, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." <u>Id.</u> §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." <u>See</u> 20 C.F.R. §§ 404.1545 and 416.946 (2010). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d)

when evaluating the opinions of medical sources on issues reserved to the Commissioner. <u>See</u> Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." <u>Id</u>. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." <u>Id</u>. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2010). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." <u>Id</u>. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more

weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more

knowledge a treating source has about a claimant's impairment, the more weight will be given to the

source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors

of supportability (the more evidence, especially medical signs and laboratory findings, in support of

an opinion, the more weight will be given), consistency (the more consistent an opinion is with the

evidence as a whole, the more weight will be given), and specialization (more weight given to an

opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling

weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the

opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and

416.927(f)(2)(ii) (2010). The ALJ, however, is not bound by any findings made by state agency

medical or psychological consultants and the ultimate determination of disability is reserved to the

ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

     In evaluating the opinions of treating sources, the Commissioner generally must give more

weight to the opinion of a treating physician because the physician is often most able to provide "a

detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2) (2010). Nevertheless, a treating physician's opinion is afforded "controlling weight only

if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and

(2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55

(W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). The opinion of a

treating physician must be weighed against the record as a whole when determining eligibility for

benefits. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2010). Ultimately, it is the responsibility of the

Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of

evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court

must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

In the instant case, the ALJ summarized the medical evidence, including the treatment notes and opinions of Ms. Jennings and Dr. Cofer and Ms. Jarrell's opinion. (Tr. at 23-25.) The ALJ placed great significance on the opinion of Ms. Jarrell because she examined Claimant, well-explained her opinion, and provided diagnostic rationale. (Tr. at 24.) The ALJ also noted that Ms. Jarrell's opinion was consistent internally and with the record as a whole. (Tr. at 24-25.) She gave less weight to the opinion of Ms. Jennings because although she examined Claimant, her report contained internal inconsistencies and her opinion was less persuasive. (Tr. at 25.) The ALJ noted that her opinion was inconsistent with her own treatment notes and with Dr. Cofer's treatment notes. (Id.) Furthermore, the ALJ noted that Claimant's depression and anxiety improved and were caused primarily by life stressors. (Id.)

The ALJ noted that Claimant received essentially routine and conservative treatment for her depression and panic disorder. (Tr. at 24.) She noted that Claimant's depression was largely situational in nature, with exacerbations due to her mother's death, frustration over denied benefits, and continuing pain. (Id.) The ALJ noted that the November 2007, psychological evaluation by Ms. Jennings revealed exam results that were less severe than the results of the self-reporting measurements, which indicated severe depression, anxiety, and somatization. (Id.) On exam, Ms. Jennings noted normal speech, insight and judgment, and recent memory, with only mild deficiencies in immediate memory and concentration, and moderate deficiencies in remote memory. (Id.) She also

23

noted an assessed GAF of 55, which was indicative of only moderate deficiencies. (Id.) Despite these relatively benign exam findings, Ms. Jennings opined that Claimant was unable to work. (Id.) As of June 2009, however, Ms. Jennings noted that Claimant had good response to treatment and that she reported feeling well. (Tr. at 24.) The ALJ therefore, noted that Claimant's mental health symptoms had improved. (Id.)

The ALJ noted that the improvement was consistent with Dr. Cofer's treatment notes, which revealed in April 2010, that she essentially was doing well. (Tr. at 24.) The ALJ also noted that Ms. Jarrell reported in 2008, that Claimant was only mildly anxious and depressed; exhibited normal insight, judgment, and immediate and remote memory; and had only mildly deficient recent memory. (Id.) The ALJ concluded that Claimant's mental impairments resulted in only mild limitations in maintaining activities of daily living, social functioning, concentration, persistence, and pace, and no episodes of decompensation each of extended duration. (Tr. at 19-20.)

Based on the foregoing, the Court finds that the ALJ's decision to give the opinion of Ms. Jennings less weight than the opinion of Ms. Jarrell is supported by substantial evidence. Ms. Jennings's mental status examination in November 2007, was relatively unremarkable, with the exception of the self-reported measurements. As evidenced by the treatment records of Ms. Jennings and Dr. Cofer, Claimant's depression and other conditions varied with the particular life stressors with which she was struggling. Her condition overall seemed to improve when not dealing with the life stressors, and therefore, her conditions appeared situational and not continual, as in severity, as the ALJ found. The ALJ properly noted that Ms. Jennings assessed a GAF of 55, which was but one factor that contradicted her opinion that Claimant was unable to work. Furthermore, the ALJ properly noted that Claimant's conditions improved, as evidenced by the treatment notes of Ms. Jennings and Dr. Cofer. Ms. Jarrell's opinion was more consistent with the evidence as a whole, and she did not rely

24

entirely on Claimant's subjective reports. Accordingly, the Court finds that the ALJ's decision to not give controlling weight to the opinion of Ms. Jennings is supported by the substantial evidence of record.

Listing 12.04.

Claimant also alleges that had the ALJ given the opinion of Ms. Jennings appropriate weight, she would have met Listing 12.04. (Document No. 9 at 12.) "The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity," regardless of age, education or work experience, see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990); 20 C.F.R § 416.925(a) (2010). Section 12.04 of the Listing of Impairments provides criteria for determining whether an individual is disabled by affective disorders. Affective disorders are characterized by mood disturbances, accompanied by full or partial manic or depressive syndrome. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (2010). The required level of severity for Listing 12.04 is satisfied when the requirements in the following sections "A" and "B" are satisfied, or when the requirements in "C" are satisfied:

> A. Medically documented persistence, either continuous or intermittent, of one of the following:
> 1. Depressive syndrome characterized by at least four of the following:
> a. Anhedonia or pervasive loss of interest in almost all activities; or
> b. Appetite disturbance with change in weight; or
> c. Sleep disturbance; or
> d. Psychomotor agitation or retardation; or
> e. Decreased energy; or
> f. Feelings of guilt of worthlessness; or
> g. Difficulty concentrating or thinking; or
> h. Thoughts of suicide; or
> I. Hallucinations, delusions, or paranoid thinking; or
> * * *
> AND

25

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
1. Repeated episodes of decompensation, each of extended duration; or
2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Claimant appears to argue that had controlling weight been given to Ms. Jennings's opinion, then she would have met the "A" and "B" criteria of Listing 12.04. She does not assert that she met the "C" criteria. The Court first notes that as discussed above, the ALJ's decision not to give Ms. Jennings's opinion controlling weight is supported by substantial evidence of record. The ALJ relied on the reviewing state agency consultants' opinions and the opinion of Ms. Jarrell in finding that Claimant's mental impairments resulted in no more than mild limitations in activities of daily living, social functioning, concentration, persistence, or pace and no episodes of decompensation each of extended duration. (Tr. at 19-20.) The Court also has determined that the ALJ properly gave greater weight to the opinion of Ms. Jarrell. Thus, the Court finds that the ALJ's decision at step three of the sequential process is supported by substantial evidence.

Dr. Cofer:

Finally, Claimant alleges that the ALJ erred in ignoring Dr. Cofer's opinion and failing to explain properly the basis for the weight given his opinion. (Document No. 9 at 12.) The ALJ summarized Dr. Cofer's opinion and accorded partial weight to Dr. Cofer's opinion to the extent it was

26

consistent with her RFC assessment. (Tr. at 23, 25.) The ALJ noted that after his opinion in December 2009, Dr. Cofer reported in April 2010, that Claimant had no specific complaints and that her heart had regular rhythm, without murmurs, lifts, or gallops. (Tr. at 23.) Physical exam was unremarkable and Dr. Cofer refilled Claimant's medications. (Tr. at 538.) As the Commissioner notes, the ALJ reviewed all the medical evidence of record in the pages preceding her discussion on the opinion weight, as well as Claimant's testimony and reports. (Tr. at 22-25.) She noted that the record failed to support Claimant's allegations of cardiac disease, despite her allegations of chest pain. (Tr. at 22-23.) The undersigned notes that Dr. Cofer's opinion also was rendered prior to her motor vehicle accident. Thus, the ALJ's decision as a whole supports her decision to accord only partial weight to Dr. Cofer's opinion as it was consistent with her assessed RFC. The Court finds that the ALJ's decision is supported by the substantial evidence of record.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 9.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 10.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: September 30, 2013.

R. Clarke VanDervort
United States Magistrate Judge

27